

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

## NO. PD-0332-22

---

**ROBERT F. HALLMAN, Appellant**

**v.**

**THE STATE OF TEXAS**

---

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SECOND COURT OF APPEALS
### TARRANT COUNTY

---

RICHARDSON, J., delivered the opinion of the Court in which SCHENCK, P.J., and YEARY, NEWELL, KEEL, MCCLURE, FINLEY, and PARKER, JJ., joined. WALKER, J., did not participate.

## O P I N I O N

Appellant Robert Hallman was convicted for multiple sex crimes against one of his children. He moved for mistrial during the punishment phase after discovering that the State, in violation of Article 39.14, failed to timely disclose thirteen pages of a family violence packet and his then-wife's handwritten statement related to a domestic assault extraneous to this case. The questions before this Court are (1) what the appropriate

standard of review is for such a violation, Texas Rule of Appellate Procedure 44.2(b) or the three-prong *Mosley* test,[1] and (2) whether the trial court abused its discretion in denying Appellant a mistrial. For the reasons below, we hold that the non-constitutional harmless error analysis under Texas Rule of Appellate Procedure 44.2(b) is the appropriate standard of review and that the trial court did not abuse its discretion in denying Appellant's motion for mistrial.

### Background

Appellant and his wife, Kim, had a volatile and frequently violent relationship, which finally ended in divorce in 2016. They share four children: Rita, Amy, Ron, and Kelly—in order of age. Numerous calls to the police were made during the course of the relationship reporting domestic violence. Due to the volatility, Appellant was in and out of the family home over the course of several years and was, at times, homeless and living out of his truck. Even when they did live together, there were periods when Kim and Appellant did not get along and slept separately. After a domestic incident in August of 2014, Appellant was charged with assault after he hit both Kim and their son Ron in the face. Subsequently, Kim and the children moved into an apartment to live separately and

---

[1] *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Where improper argument has been made, the *Mosley* test evaluates three factors when looking for harm:

> (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks),
>
> (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and
>
> (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).

acquired a restraining order against Appellant. Child Protective Services (CPS) also became involved and began holding regular counseling sessions for Rita and Amy. Appellant was given limited visitation rights which eventually included the ability to drive Amy and Rita to their counseling sessions.

In March of 2016, Amy decided to live with Appellant after an argument with Rita and her mother, Kim. Several days later, Rita made an outcry of sexual abuse against Appellant. In April of 2016, Appellant was arrested while attending class at Tarrant County College while Amy was waiting in Appellant's truck, a Chevy Tahoe. Both of them, homeless over the last month, had been living in Appellant's vehicle using a fake temporary license plate. During a forensic interview, Amy denied that she suffered any sexual abuse from Appellant. Consequently, the Chevy Tahoe was never seized nor searched by the police before being sold. Kim subsequently filed for divorce which was finalized later that same year.

On February 12, 2017, the eve of Appellant's trial for sexual abuse against Rita, Amy made a delayed outcry of sexual abuse by Appellant. Jury trial was consequently delayed until 2018. Appellant was convicted only under the sex abuse charges pertaining to Amy. Specifically, Appellant was convicted for two counts of aggravated sexual abuse of a child under 14, three counts of indecency with a child by contact, and one count of sexual assault of a child under 17. Appellant was acquitted of the remaining count of continuous sexual abuse of a child under 14 that pertained to both Amy and Rita. For each of the six counts he was found guilty of, the jury sentenced him to life imprisonment to run

concurrent to each other. A major portion of Appellant's defense was that Kim coached Amy and Rita into making the allegations.

Twelve witnesses testified in total during the guilt-innocence phase of the trial. Amy and Rita gave detailed testimony of long-term grooming and sexual abuse by Appellant spanning from around 2010 for Rita and 2011 for Amy when each 12 years old. Both of their testimony about the grooming and sexual abuse was detailed and consistent with each other. In support, the State called a SANE nurse who examined Amy to testify to the numerous types of sexual acts that Appellant forced Amy to perform. The State also called an expert forensic interviewer who interviewed both Amy and Rita. Having forensically interviewed almost 1700 children, she opined that Amy and Rita were not likely being coached into claiming sexual abuse. Nevertheless, Amy and Rita neither reported the sexual abuse during CPS ordered counseling sessions years later nor told each other until just prior to the first trial date in 2017.

Kim, Appellant's now-ex-wife, also testified against Appellant. Her testimony included the extraneous domestic violence incidents on August 9 and August 10, 2014. In the August 9 incident, Appellant claimed Kim had assaulted him. No arrests were made. In the August 10 incident, Appellant was reported as the perpetrator of a domestic assault for which he was arrested. During the latter incident, Kim claimed that she told police she had suspicions that Appellant was sexually molesting Amy. She also claimed that an officer subsequently pulled Amy aside and spoke to her. However, Kim testified that she couldn't remember which officer she talked to nor what he looked like. Amy also testified that

police, in 2014, did ask her if Appellant had been abusive or sexually abusive to her and that she had told them no.

The defense called Detective Cesar Robles, one of the two police officers who responded to the extraneous domestic violence call on August 10, 2014. Det. Robles testified that he had no independent recollection of the incident other than his offense report. However, he testified affirmatively that Kim never told either officer of any suspicions of sexual abuse—otherwise it would have been investigated and at the very least noted in the offense report.

During closing arguments, Appellant's trial counsel argued that the evidence was insufficient because it was all circumstantial and that claims must have been fabricated. Nevertheless, the guilt-innocence phase ended with the jury finding Appellant guilty of the six counts listed above. During the punishment phase, the State disclosed 13 pages of additional discovery regarding the extraneous August 10, 2014 incident. These included an affidavit by Det. Robles, Kim's handwritten statement, Appellant's handwritten statement, and a family violence packet. Det. Robles's affidavit was substantively identical to the offense report. Both Appellant's and Kim's handwritten statements only detailed their respective viewpoints of how the immediate physical altercation unfolded. (19 RR 587, 588) ("State's Exh. 37 & 38"). Neither of them contained any mention of ongoing abuse in the home outside of the altercation. Specifically, Kim's statement made no affirmative claim or refutation of any suspicion of sexual abuse against any of the children.

5

Documents within the family violence packet were also consistent with Det. Robles's testimony. In the packet, twenty-five items were listed as options to describe the nature of the incident. "Hitting with Fist (closed), "Grabbing," and "Restraining" were the only items marked. "Sexual Assault," and "Threat of Sexual Assault" were not marked.

The trial court then recessed the trial for two hours to give Appellant's trial counsel time to review the new evidence. The trial court also offered the defense the ability to recall any witness for cross-examination based on the new material. The defense argued that the damage had been done and could not be cured by allowing cross-examination after the guilty verdict. After the recess, Appellant's counsel moved for a mistrial. The trial court denied Appellant's request and observed that the newly disclosed information was cumulative to Det. Robles's offense report:

> "[T]he Court is not ruling that everything contained in State's Exhibit 36 [offense report] is not relevant and not material, but the Court is merely ruling that there is not additional information in State's Exhibits 37 [Appellant's statement] and 38 [Kim's statement] that are not contained in State's Exhibit 36 . . . ."

### Appellate Procedural History

On direct appeal to the lower appellate court in Fort Worth, Appellant asserted that the trial court abused its discretion by denying mistrial after the State violated Article 39.14's discovery requirements. The court below held that the untimely-disclosed evidence was "material" under Article 39.14 after applying the analysis for materiality under *Brady v. Maryland*. After further holding the State's untimely disclosure prejudiced Appellant's

ability to demonstrate that his accusers were lying, the court of appeals reversed the conviction and remanded the case for new trial.

### *The first petition for discretionary review*

The State filed a petition for discretionary review with this Court on July 27, 2020, complaining that the court of appeals misapplied the materiality prong under *Brady*. The State also complained that the court of appeals had overemphasized the impact of Kim's testimony from the remaining array of inculpating evidence. That failure to consider it in context, the State argued, denied the appropriate deference to the trial court's mistrial ruling.

On March 3, 2021, this Court decided *Watkins v. State*, 619 S.W.3d 265 (Tex. Crim. App. 2021), where we defined the term "material" as used in Article 39.14. There we held that "[e]vidence is material if it has some logical connection to a consequential fact." *Watkins*, 619 S.W.3d at 269 (internal quotes omitted). Turning to Appellant's case, this Court then vacated the judgment of the court of appeals and remanded the case for reconsideration in light of *Watkins*.

### *On remand to the Fort Worth Court of Appeals*

On remand, the Fort Worth Court of Appeals held that the State's failure to timely disclose the new evidence was a violation of Article 39.14 Subsection (h) rather than Subsection (a). The court of appeals reasoned that *Watkins*'s definition of materiality did not control because Subsection (h) placed a "free-standing duty" on the State to disclose impeachment evidence. *Hallman v. State*, 647 S.W.3d 805, 817 (Tex. App.—Fort Worth

2022). And the State's failure to disclose the statements and the family violence packet prior to the punishment phase was erroneous under Subsection (h). "But the actual error presented [on remand at the court of appeals] is whether the trial court abused its discretion by denying [Appellant's] motion for mistrial on the Article 39.14(h) violation." *Id*. And as the lower court recognized, that question depended on whether Appellant was harmed.

The court of appeals ordered briefing and held oral arguments on the question of proper harm analysis. On appellate review before a three-person panel, the court of appeals reversed the trial court and ordered a new trial. Justice Wallach, writing for the lower appellate court, applied the *Mosley* three-factor test to conclude that "the nonconstitutional harm that [Appellant] suffered was severely prejudicial." *Id*. at 843.

Justice Walker, concurring that there was reversible error, opined that the appellate court should have also addressed the error under Article 39.14(a). Justice Walker further asserted that the State's violations under Subsections (a) and (h) should be viewed under the harmless error analysis of Texas Rule of Appellate Procedure 44.2(b) rather than the *Mosley* three-factor test. *Id*. at 855 (Walker, J., concurring).

> I do not believe that the timing of the State's disclosure should affect our reversibility analysis. At its core, the error affecting [Appellant's] trial is a statutory violation—the State's failure to disclose under Article 39.14. The reversibility of that error should be assayed under Rule 44.2(b)'s substantial-rights test and not for incurable prejudice.

*Id*. at 854-55.

Justice Womack, the lone dissenter, argued that reversal of the trial court was not warranted because there was no prejudicial effect from the misconduct under either the

*Mosley* three-factor test or a harmless error analysis under Rule 44.2(b). *Id*. at 846-53 (Womack, J., dissenting). Justice Womack argued that the certainty of conviction was so strong absent the misconduct, the effect of the State's violation had a *de minimis* effect on the outcome. *Id*. Therefore, because Appellant's substantial rights were not affected, per Justice Womack, the trial court did not abuse its discretion in denying mistrial.

### *The second petition for discretionary review*

On the State's petition, we granted discretionary review for a second time to determine whether the trial court abused its discretion in denying Appellant's motion for mistrial. Having already conceded error in the appellate court below, the State first asserts that deciding the appropriate harm analysis is a necessary subsidiary question to the question on which we granted review. The State agrees with Justice Walker's concurrence and Justice Womack's dissent that Rule 44.2(b), not *Mosley*, supplies the appropriate analysis. However, the State diverges from Justice Walker's result. Instead, the State argues that Justice Womack's application of Rule 44.2(b), finding only harmless error in light of other overwhelming evidence of guilt, is the correct conclusion. Thus, the State argues, the trial court did not abuse its discretion in denying mistrial.

In opposition, Appellant asserts that the Court of Appeals was correct in ordering a new trial. Moreover, Appellant argues, the court below correctly utilized the *Mosley* three-factor test as the appropriate analysis to find harmful error. Alternatively, Appellant asserts that because Article 39.14(h) was founded on constitutional principles, the appropriate standard for analysis is under Rule 44.2(a)—the test for constitutional error. Nevertheless,

9

Appellant argues that the Court of Appeals was correct in holding that the trial court abused its discretion in denying mistrial.

### *Mistrial,* **Mosley v. State***, and Texas Rule of Appellate Procedure 44.2*

We agree with the State that whether the trial court abused its discretion depends on the subsidiary question of whether Appellant was irreversibly harmed by the State's error. However, because the State's error was a statutory violation, we disagree with Appellant's assertion that Rule 44.2(a) is the appropriate analysis. Instead, we must decide between the *Mosley* three-part test or Rule 44.2(b) in order to see if the trial court abused its discretion in denying a mistrial.

"A mistrial is a device used to halt trial proceedings when error is so prejudicial that expenditure of further time and expense would be wasteful and futile." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). Thus, a trial court may declare a mistrial "if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error." *Id*. "A trial court's denial of a mistrial is reviewed under an abuse of discretion standard." *Id*. (citing *State v. Gonzales*, 855 S.W.2d 692, 696 (Tex. Crim. App. 1993)). A reviewing appellate court will "reverse only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009) (internal quotes omitted). "The appellate court is not to substitute its judgment for that of the trial court, but rather must decide whether the trial court's decision was arbitrary or unreasonable." *Gonzales*, 855 S.W.2d at 695 n.4. Absent

such an abuse of discretion, an appellate court "would not be justified in reversing the judgment." *Smith*, 286 S.W.3d at 339.

"The determination as to whether a given error calls for a mistrial must be made by examining the peculiar facts and circumstances of each case." *Hernandez v. State*, 805 S.W.2d 409, 414 (Tex. Crim. App. 1990). "Error is not reversible if it is harmless." *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

In *Mosley v. State*, this Court was faced with error where the prosecutor made inappropriate closing arguments to the jury. 983 S.W.2d at 259. There, the trial court erred when it failed to sustain appellant counsel's objection. *Id*. Because the error was not of constitutional dimension, this Court applied Texas Rule of Appellate Procedure 44.2(b) to determine whether there was harm and whether a new trial was warranted. Texas Rule of Appellate Procedure 44.2(b) states: "Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Under this rule, "a substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, if the error had no influence on the jury, "or had but very slight effect, the verdict and the judgment should stand." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016).

In construing Rule 44.2(b) to the peculiar facts and circumstances of the case, the *Mosley* Court examined three factors to see if the error had any "substantial and injurious effect" on the verdict. These Rule 44.2(b) factors included:

> (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks),
>
> (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and
>
> (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction).

*Mosley*, 983 S.W.2d at 259. After a complete review of the error in the context of the record, this Court concluded that the error was harmless under Rule 44.2(b) "[g]iven the mildness of the [inappropriate] comments and the strength of the State's case." *Id*. at 260; *see also id*. at 259 ("We find that such comments constitute 'other errors' within the purview of Rule 44.2(b).").

Accordingly, as the analysis in *Mosley* shows, the *Mosley* factors are merely an application of Rule 44.2(b)—a derivative created because of the facts in *Mosley*—not a competing alternative. There is no conflict between the *Mosley* factors and Rule 44.2(b). Thus, the correct standard in a harm analysis of a non-constitutional error, as in this case, is what it has always been: Texas Rule of Appellate Procedure 44.2(b).

### The Evidence Against Appellant

In order to evaluate whether there was "substantial and injurious effect or influence in determining the jury's verdict," we first look to the backdrop of inculpatory evidence.

Then, we compare the inculpatory evidence against the magnitude of the alleged error to see whether the error had only a "very slight effect" or if there was "substantial" harm. Here, there was an abundance of inculpatory evidence against Appellant.

### *Rita's Testimony*

Rita, the older of the two complaining witnesses, testified that Appellant groomed and sexually abused her from an early age. She testified that Appellant manipulated her and Amy by pitting them against their mother, Kim, by claiming she was jealous of them. (10 RR 64-65). Because of his efforts to undermine their relationship to Kim, Rita was not close to her mother until she started going to work with her. Amy, according to Rita, remained closer to Appellant. She testified that Appellant, who worked partly as a preacher and participated heavily in church, told her that "back in Bible times, that fathers would have sex with their daughters." Furthermore, Rita testified that Appellant required sexual acts from her or Amy whenever he bought them clothes or supplied marijuana:

> When me or my sister wanted something from him, he would always, . . . tell us to do things like to him, or we had to let him see one of our private parts if wanted something like clothes or shoes or anything.

Rita testified that Appellant molested her by placing his hands in her pants on a nightly or near-nightly basis. He also demanded sexual intercourse from Rita numerous times, which Rita always refused. Appellant physically punished Rita's refusal by once slapping her on the back hard enough to leave a handprint and make Rita cry. When she was 14 to 16 years old, Appellant frequently asked Rita to show him her breast or genitalia whenever she wanted to sleep at a friend's house. She also detailed one incident when Appellant entered

13

her room and inserted "hisself" inside of her while telling her to be quiet. Rita testified that Appellant's act of penetration was "uncomfortable and scary." According to Rita, Appellant's last sexual contact with her was when she was 16 years old.

*Amy's Testimony*

Amy, the younger daughter, testified that Appellant abused her daily from 2012 to 2016. During this time, Amy and Rita's mother, Kim, financially supported the family while Appellant earned some money selling scrap metal. According to Amy, Kim typically returned home from work around 9:00-10:00 pm. Because Amy was being bullied at school, she was homeschooled starting at 11 or 12 years old. Meanwhile, Rita, a freshman in high school, had band practice till late in the evening. Rita usually would not get home until at least 7:00 pm or 1:00 am if there was a game. Thus, Amy was typically alone with Appellant for most of the day on most days.

Nevertheless, even when others were home at night, Appellant slept in the living room while Kim slept in a separate bedroom with the door closed. According to Amy, Appellant frequently checked to make sure that Kim's door was shut so that "she couldn't get up" undetected and so that Kim wouldn't see Appellant going into Rita and Amy's room at night.

Kim and Appellant's relationship, according to Amy, was volatile and they would sometimes throw things at each other. Amy testified that she saw Appellant physically abuse Kim several times. Appellant also sought to isolate Rita and Amy from becoming close to their mother by telling them negative things about Kim. Telling them that Kim was

"evil" or the "devil," Appellant found ways to discourage Kim from coming out of her room by saying "mean things" as a way to keep Rita and Amy from their mother. (12 RR 57-58).

Amy testified that she first felt uncomfortable during the seventh or eighth grade when Appellant made her and Rita play a game called "butt plugs."

> And what he would do is—it would start by us like—basically he would start by, you know, trying to touch us, and we would laugh, you know. And it would begin as that, and then we'll start wrestling. It'll be like him trying to get us. But once he did get us, he'll try to pull our pants down and put his hand between our [Amy's and Rita's] butt.

(12 RR 61).

Another instance is when Appellant, according to Amy, asked her if she had started growing pubic hair. Amy also detailed an incident where, when she was 12 years old, Appellant pulled down her pants and put his mouth on her genitalia. When Amy pushed him away told him to stop, Appellant then forced his private parts into her private parts. After she yelled from the pain, Appellant told her to be still and eventually ended the encounter by ejaculating into his hand.

Although Amy testified that Appellant never molested her in her bed, she recalled seeing Appellant molesting Rita at night:

> I remember nights where I would be laying in my bed [a]sleep, and then I would see [Appellant] creeping into our room. And then sometimes I would pretend to be [a]sleep, but when—if I just so happened to wake up, I would look over and I would see him in [Rita's] bed. He had his hands up under the cover, and I would just see his hands moving around, you know, at the time. And I would [look] at him, and he would just look at me and go

15

"shhh," like that. And I wouldn't—I didn't even say—like I didn't scream or anything. I would just turn back over.

Additionally, although Appellant never molested Amy in Amy and Rita's shared room, she testified that he would whisper to her or sometimes enter the room and shake her to get out of bed and come with him. Bringing her into the living room or computer room, Amy testified that Appellant would have her perform numerous types of sexual acts. In her testimony, Amy described many of these acts in detail, including some that involved including viewing or incorporating the viewing of pornography. Some of these incidents, according to Amy, happened after Appellant sexually abused Rita.

Amy testified that when she was 16 years old, she got into an argument with Rita and called Appellant to pick her up. During this time, Amy testified that she did not have a firm connection with her mother, Kim. Over her mother's objections, Amy left to live with Appellant in his truck and the occasional motel room. Applying for food stamps and Medicaid, they also visited food banks and sought financial assistance from church. Appellant also took Amy to his job as a remodeler, and she waited nearby while he attended classes at the Tarrant County College. During these two months, Amy testified that Appellant would force her to have sexual intercourse whenever they slept in a hotel. She further testified that Appellant tried to normalize the sexual abuse by talking about the Bible and saying "[t]hat God said it's nothing wrong with what he's doing." Amy testified that she believed Appellant's justifications at the time but had stopped by the time of trial.

Amy made her outcry to Kim the day before Appellant's trial arising from the allegations made by Rita. Amy stated that it was a combination of Rita's strength and her pastor's statement at church that caused her to make the outcry. After church, Amy testified that she approached her mother in her mother's room and closed the door. She then "poured" out her feelings to Kim about the abuse.

### Kim's Testimony

Kim testified that she suffered from bipolar disorder and a number of other ailments, several which also caused chronic fatigue. She took 26 medications to treat these ailments—some which also caused her to be additionally drowsy: "Once I'm [a]sleep, I'm [a]sleep. I don't hear anything or anyone." Kim's bedroom was also a converted garage that was more insulated from the rest of the house. Thus, sounds from the rest of the house were not very audible in her bedroom.

Kim testified that Appellant pitted Rita and Amy against her and against each other. According to Kim, Appellant told Rita and Amy that they did not have to respect Kim. Over Kim's objections, he also frequently took them shopping where he would buy lingerie or other inappropriate items for them. He would keep Rita and Amy up late to watch movies and "make it a point to sit at" their room door late at night. If challenged, he claimed he was spending time with his kids and that "those are his daughters and he can do what he want[s]." (11 RR 117).

Sometime in 2010, Kim learned that Appellant asked Rita to rub lotion on his penis. When Kim confronted Appellant about it, he told her that he mistakenly thought then-12-

year-old Rita was actually Kim. At the time, Kim chalked up the episode to Appellant being drunk. (11 RR 120-26).

According to Kim, Appellant treated Amy more like a wife than a daughter. "He did not allow her to leave out of his sight. He did not allow her to leave and go anywhere with me." (11 RR 117). During the times he was staying with his sister, Appellant always slept in the same room as Amy. He would keep her close to him all the time and had her walk in her robe to get in his truck where they would often stay there together until past midnight— even on school nights. On the occasions that Kim found them in his truck and told them to come back inside, Appellant told Amy that she didn't have to listen to Kim. And because of her fear of further domestic abuse at the hands of Appellant, Kim testified that she never pressed the issue. When she asked if "anything was going on with him [and the girls]," he said she was "crazy and, no it was not going on."

Due to the domestic abuse, Kim tried to separate from Appellant several times but found it hard to do so because of childcare issues, especially with the younger children, and a fear of reprisals against herself and the children if she involved the authorities. Kim testified that Appellant threatened to kill them if they sent him to jail: "If we ever sent him to jail, it was a known fact, he told myself and the children, if we ever sent him to jail that he would kill all of us." (11 RR 128). Kim testified that the threat was concerning because she had seen how violent Appellant had been in the past. (11 RR 129).

In March of 2016, Kim testified that Amy became angry because Kim would not allow Appellant to live with them even though he was homeless at the time. According to

18

Kim, Amy called Appellant to pick her up. After Amy left with Appellant, Kim reported the situation to CPS. Amy and Appellant lived out of Appellant's truck for roughly a month. Although Appellant was attending classes at Tarrant County College, Amy did not attend school during that time. Three days after Amy left with Appellant, Rita made her sexual-abuse outcry. However, in 2017, Rita changed her mind about testifying leading up to trial because, according to Kim, she was afraid. On the day before trial, Amy made her outcry to Kim.

### Theresa Fugate's (SANE Nurse) Testimony

Theresa Fugate, a SANE nurse, examined both Rita and Amy on March 23, 2016, and February 17, 2017, respectively. According to Fugate, Rita and Amy were able to detail numerous acts of sexual abuse including genitals-to-genital contact, Appellant's finger-to-her-genitals contact, and her-hand-to-Appellant's genitals contact. Rita and Amy also reported "general fondling," which included fondling, licking, and kissing the genital area.

According to Fugate, Rita told her that the first instance of abuse began when she was around 12 years old. Appellant was laying on the couch and told her to rub Vaseline on his genitals. Once Kim found out, she kicked him out of the house. However, he moved back in when Rita was 13 and "started coming in [her] room at night and touching [her] privates." Because she was scared, Rita pretended to remain asleep.

When she was 15 years old, per Fugate's testimony, Rita claimed that Appellant entered her room, touched her privates, got on top of her, and sexually assaulted her despite her attempts to kick him off. Both Appellant and Rita were alone in the house at the time.

19

The next night, both of them were again alone in the house. Appellant attempted to sexually assault Rita again. However, Rita told Fugate that she managed to fight him off. Angry, Appellant responded by hitting Rita in the back hard enough to leave a bruise. According to what Rita told Fugate, the sexual abuse continued until Rita was 15 years old.

Fugate testified that Amy's reported sexual abuse also started around when she was 12 years old. When he was living together with them in the home:

> He made it seem like it was normal to do that. . . . He would do stuff to me, you know, put his privates in my privates like every other night. He would come in at night when everybody was asleep, but it wasn't always at night. Just when we were alone. He did it in the living room and in the computer room.

Once Amy decided to leave with Appellant to live homelessly, Amy told Fugate that Appellant would take her to hotels and sexually assault her there.

### *Samantha Torrance's (Forensic Interviewer) Testimony*

Samantha Torrance, a veteran forensic interviewer who had interviewed almost 1700 children, also testified regarding her forensic interview of Rita and Amy. In her effort to remain focused on objective fact-finding, Torrance asked developmentally appropriate, nonleading, nonsuggestive questions based on two research-based protocols followed in Texas and nationally. (12 RR 112-16). Torrance testified that she had no decision-making role in the investigation outside of conducting the fact-finding interview and that she was not a part of law-enforcement. (12 RR 117, 165). Per her testimony, Torrance's questions were her own and were not prompted nor prepared by law enforcement beforehand. (12 RR 130).

Torrance's questions included open-ended questions focusing on sensory details (what the child could hear, see, and feel) and peripheral details (other details or events surrounding the incident). According to Torrance, sensory and peripheral details are useful in corroborating the child-subject's claim of sexual abuse and detecting if the child-subject is being coached or fabricating their claim:

> [W]e're always going to be looking for any kind of red flags. For example, if they're not allowed to – excuse me – if they're not able to provide the details we would expect them to be able to provide for a child their age, we might also be getting information about who all they've talked to about this allegation before they came to talk to us, and whether or not anyone told them to tell us anything or keep secrets or anything like that. And if a child were to say that someone had told them to say something or they weren't able to provide the details we would expect, we might have some concerns that there's potentially coaching or something else going on.

(12 RR 132).

In each respective interview, Torrance was alone with the subject (either Rita or Amy) in the interview room while detectives and CPS watched it via a closed-circuit video feed in a separate monitoring room in the Alliance for Children building. Kim, per forensic interview policy, was allowed in neither the interview room nor the monitoring room. Torrance testified that during her interviews with Rita and Amy, she felt that both Rita and Amy were each respectively able to open up to Torrance and feel very comfortable talking with her. During these interviews, Torrance testified that she found no reason during their respective interviews to believe that Rita and Amy were coached or were fabricating their claims of sexual abuse. Specifically regarding Amy's interview, Torrance testified that Amy was able to relay both sensory and peripheral details consistent with her claims.

Torrance also testified regarding the grooming methods that perpetrators of child sexual abuse often utilize to obtain access and opportunity. The purpose of grooming, per Torrance, is to "develop some kind of trust or relationship with that victim so that when the perpetrator does decide to act on the victim, they're more conflicted about telling. It helps develop a level of secrecy." (12 RR 142). Torrance further testified that the act of grooming seeks to isolate the victim from others.

> A perpetrator might tell a child that if they tell somebody, he's going to get in trouble, or somebody is going to get hurt or something bad is going to happen.
>
> ***
>
> It's very common that victims of sexual abuse think they're the only one and this isn't happening to anybody else. And there's no one else who's going to believe them because no one understands what they're going through. . . . A lot of times siblings are surprised that it was happening to someone else in the family.
>
> ***
>
> Again, it helps cut off that child's support system or safety net so that the child might feel like if they do tell, the only person who provides that attention and care what – they would lose that person, if they think that the perpetrator is the only one that they have in their lives.
>
> ***
>
> We oftentimes see that abusers tell children to keep secrets and don't tell. And they'll use not necessarily forceful threats, but even just things like, you know, no one is going to believe you, and this is your fault too, or you're dirty, you're tarnished. No one is going to love you anymore.

(12 RR 142-44).

Torrance testified that some perpetrators groom their victims by buying lingerie, bras, and sex toys. And especially in intra-familial sexual abuse scenarios, perpetrators seek

to normalize the abuse: "They don't understand that this isn't what happens in other homes. And as a result, they don't see it being important to tell, because this is just what happens at home and everybody acts normal." (12 RR 146). Torrance testified that she had seen also religion used as a grooming tactic in previous cases to justify the perpetrator's sexual abuse and prevent the child-victim from being able to talk about it. (12 RR 149).

### *Detective Jonathan McKee's Testimony*

Detective Jonathan McKee was assigned the case the day after Rita made her outcry on March 9, 2016. Because police are not trained to interview children in sex abuse cases, he set up the forensic interview with Torrance for March 14 and a SANE exam on March 23, 2016. Because Detective McKee was watching the forensic interview of another victim in another case, he was unable to watch Rita's forensic interview. Detective Kesler watched it instead.

Detective McKee obtained a warrant for Appellant's arrest on March 25, 2016—two days after Rita's SANE exam—for sexual assault of a child under 17 years of age. (10 RR 256-59). Although CPS does not deal with criminal matters, they were notified so they could conduct their own separate investigation in order to ensure that all of Rita's siblings were safe. (10 RR 260). CPS conducted a screening interview of the siblings still residing with Kim and Rita. During the screening interviews, the children were asked direct questions (as opposed to open-ended questions used in forensic interviews) such as how they're fed and how they're punished. (10 RR 261). None of the siblings still residing with Kim and Rita made any claims of sexual abuse.

Because Amy and Appellant were homeless, Detective McKee testified that until Appellant's arrest on April 7, 2016, nobody knew where Amy was in order to conduct a screening interview. (10 RR 262). However, after Appellant was arrested, Amy was taken to the Alliance for Children building, where Amy was released to CPS custody. Although he was not present for it, Detective McKee testified that CPS conducted a screening interview where Amy denied any sexual abuse by Appellant. This was the only time that Detective McKee was aware of where Amy was asked about but denied any sexual abuse during the course of his investigation.

Amy made a delayed outcry of sexual abuse on February 13, 2017. (11 RR 54-56). Detective McKee testified that he learned of Amy's delayed outcry the day prior to Appellant's trial based on Rita's allegations. Detective McKee testified that he was aware at the time that Rita did not want to go through with the trial. (11 RR 56). The day after Amy's outcry, Detective McKee scheduled her forensic interview. He watched it from the monitoring room on February 13, 2017. Detective McKee also scheduled a SANE exam for Amy on February 17, 2017. Based on Amy's outcry, interview and examination, Detective McKee had a second arrest warrant issued against Appellant on February 28, 2017.

### The Inconsistencies

Appellant's defensive strategy centered on the fact that there was no physical evidence (such as DNA or video recordings) to prove or otherwise corroborate his daughters' allegations of sexual abuse. Moreover, given the animosity between Kim and

Appellant, Appellant's attorney claimed that Rita and Amy were fabricating their claims of sexual abuse at the behest of their mother, Kim. From the beginning of trial, Appellant's attorney pointed out anticipated inconsistencies in the evidence for the jury to look for.

> And they [Rita and Amy] were asked, has anyone ever touched you on your privates in a way you didn't like? Has anyone ever done this to you? Has anyone sexually abused you? And what was the answer? No. During the time that this was supposedly occurring, the answer was, no.
>
> Has anyone ever shown you anything? Any pictures of someone having sex with one another? What was the answer? No. They didn't just fail to tell people. They denied being sexually abused. They were in counseling because of the turbulence of the family. Denied being sexually abused. [Amy] – when [Rita] made her outcry, [Amy] was interviewed by the police, interviewed by CPS, and she said, no, I was not sexually abused.
>
> These aren't little children, ladies and gentlemen. These are two young girls, and they're going to get up here. And they're beautiful, smart girls, but they're in a[n] impossible situation. Impossible situation. They cannot win. They live with their mother. They have no choice.

(10 RR 33-34).

As the trial proceeded, Appellant's attorney vigorously cross-examined the State's witnesses—especially where Rita and Amy's past actions conflicted with their allegations of sexual abuse. Though they both had cellphones capable of taking pictures and video recording, Rita admitted during cross-examination that she never considered recording her abuse. (10 RR 165). And while Amy also had a cell phone—even when she was living homelessly with Appellant—no recordings were ever recovered from it.

A significant portion of questioning was spent on why neither Rita nor Amy reported any sexual abuse despite numerous opportunities and avenues to do so. Rita and Amy both admitted under cross-examination that they could have outcried to a number of people

during the years they were being abused. These included several friends they regularly spent time with as well as their grandmother. Both Rita and Amy acknowledged that they could have outcried to their aunt and uncle (Amy's godparents) who lived down the street. (10 RR 155-56; 14 RR 37-39). Both also had frequent contact with their pastor and other church elders due to the family's involvement at their church. Amy also acknowledged that their mother, Kim, also spoke to them several times over the years on the subject. Their mother revealed that she had been sexually abused and told them to tell her if anyone ever inappropriately touched them. (14 RR 39-45).

The defense also highlighted Rita and Amy's repeated denials of sexual abuse to multiple sessions with CPS counselors and investigators:

Q:      And you were asked specifically, were you sexually abused?

Amy:  I honestly don't recall her [the CPS counselor] asking me that.

Q:      Would you like to look at the paperwork?

Amy:  Yes, ma'am. Well, no, ma'am. If it's there, then it's there.

***

Q:      Do you remember what you told your counselor?

Amy:  No, ma'am, I don't.

Q:      Okay.

Amy:  I've been to many counselors out of this two or three years.

Q:      Okay. Would you agree with me that you never mentioned being sexually abused?

Amy:  Yes, ma'am.

Q:      And that was despite hours and hours of talking to a woman who just wanted to help you?

Amy:  Yes, ma'am.

(14 RR 95-96).

After Rita made her 2016 outcry but prior to Amy's 2017 outcry, Amy admitted that she went with her sister and mother to the District Attorney's Office. Despite being in the same room with the prosecutors in charge of her sister's case, Amy acknowledged remaining silent on her own sexual abuse. The defense also cross-examined CPS investigator Dolores Urzua, who conducted Amy's screening interview on April 7, 2016— the day Appellant was arrested. (14 RR 143). Although the screening interview took around 21 minutes, only 6 minutes were successfully recorded. The defense elicited the following testimony regarding that interview:

> Q:      Okay. So in the part of the interview that includes the – the six minutes that actually is recorded, were there any reports of sexual abuse whatsoever?
>
> Urzua: No, ma'am.
>
> Q:      Okay. Was it clear to you and did you make – did she assure you that she understood the differences between a truth and a lie?
>
> Urzua: Yes, ma'am.
>
> Q:      Okay. Did you specifically ask her to promise to tell you the truth?
>
> Urzua: Yes, ma'am.
>
> Q:      Okay. Was there any kind of outcry, so far as the limited interview that you had with her, of any type of physical abuse?
>
> Urzua: No, ma'am.
>
> Q:      Okay. Was there any kind of outcry of sexual abuse?
>
> Urzua: No, ma'am.

(14 RR 150-51).

Kim was also extensively cross-examined. Due to the violent nature of the relationship, she called police to the residence numerous times. However, she admitted under cross-examination that she never called the police to report any suspicion of sexual abuse. And despite Kim's claims of increasing suspicions of sexual abuse, Kim admitted under cross-examination that she rarely got up at night to see if anything inappropriate was going on. She claimed that because she was tired from working late and her medications, it was hard for her to get out of bed at night. (11 RR 196).

Nevertheless, Kim testified under cross-examination that she acted on her suspicions during the August 10, 2014 incident where Appellant was arrested for domestic violence:

> Q:     Okay. So despite the fact that you have all of these suspicions and that there was this weird thing going on and this weird relationship going on that you testified to between Robert and your daughters, despite that, you didn't take special measures to make sure nothing was going on, did you?
>
> Kim:  I did take special measures of – to make sure anything was going on, because I did go to [Appellant] and ask him several times was anything going on with him.
>
> ***
>
> Q:     Okay. When did you ask him? Because you didn't tell the police this, did you?
>
> Kim:    What do you mean?
>
> Q:     You did not tell the police that you asked [Appellant] if anything was going on?
>
> Kim:  I told the police on August the 10th, 2014, that I had suspicions that Robert may have been sexually molesting Ava.

(11 RR 200-01). When asked, Kim testified that she could no longer remember what the police officer looked like. However, Kim was adamant that she reported her suspicions on August 10, 2014 to one of two police officers that responded to the call.

> Q:      Okay. But you're saying that you told that police officer that you thought [Amy] was being sexually abused?
>
> Kim:   Yes, I did.
>
> Q:      Okay. And you're saying that the police officer talked to [Amy] about that; is that right?
>
> Kim:   Yes.

(11 RR 203).

However, this claim was inconsistent with the police report, which detailed a physical altercation but made no mention of any report of sexual abuse. *See* (19 RR 584) ("State's Exh. 36: Fort Worth Police Report No. 14-76413"). The jury also heard Kim testify that she didn't mention suspicions of sexual abuse in the subsequent CPS counseling intake forms she filled out. (11 RR 209-10).

After the State rested, the defense called Officer G. Garcia—the primary officer who responded to the August 9, 2014 domestic violence call. He testified that nobody made any mention of potential sexual abuse or else he would have written it in his report. (14 RR 198-99). He also testified that he never spontaneously asked if there was any sexual abuse because it was not how he was trained. (14 RR 200).

The defense then called Detective Cesar Robles—the primary of the two officers who responded to the August 10, 2014 incident—to ask the same specific question. Though

he could not remember the incident, Detective Robles adamantly testified that Kim never made any mention of sexual abuse to him or his partner, or else he would have investigated it further and mentioned it in his report. (14 RR 207).

Nevertheless, both the State and the defense elicited testimony to account for and explain the inconsistencies in the claims of sexual abuse. Detective McKee testified that he had often seen cases where children who initially denied sexual abuse during CPS screenings made an outcry at a later time. (10 RR 267-698).

> Q:      Okay. Do you think that if a complaining witness has previously been interviewed and has denied being sexually abused, don't you think that's relevant?
>
> McKee:    No, ma'am, I don't.
>
> ***
>
> McKee:    Again, you know, like I said yesterday, okay, children – children talk about sexual abuse when they're ready to talk about sexual abuse.
>
> ***
>
> Q:      Regardless of how many times and under what circumstances that child denies being sexually abused, that doesn't matter?
>
> McKee:    No, that's very common.

(11 RR 9).

Forensic interviewer Samantha Torrance also testified that it's very common for children to deny sexual abuse during CPS screenings only to make an outcry of sexual abuse "a year, a month, however long later." (12 RR 127).

> And it's very common when we're talking about sexual abuse for victims of sexual abuse to delay disclosure for many different reasons. More—it's more

common that they're going to delay talking about what's been going on. Oftentimes because the person who's been abusing them is someone they know and trust.

\*\*\*

It's not very common that a kid gets sexually abused one time and immediately tells. It's more common that they might kind of test the waters a little bit and see how people are going to react. They might deny it for a really long time at first before they actually consciously make the decision to start talking about what they've been experiencing.

(12 RR 135-37).

Torrance testified that forensic interviewers were trained to look for "red flags"—signs of coaching or the fabrication of sexual abuse claims—during the interview. (12 RR 132). And because Amy was able to provide both sensory and peripheral details consistent to her claim of sexual abuse, Torrance testified that she had no concerns that Amy's claims were coached or fabricated. (12 RR 133-34).

A younger child who should not have had any kind of experience with sexual contact, if they can describe a sexual act with really clear peripheral and sensory details that they shouldn't know about, then that would definitely stand out a lot more than if an older child is talking about it.

(12 RR 154).

Torrance also testified that minor inconsistencies do not give her any concerns where signs of significant trauma are present:

Sometimes those discrepancies happen just because different questions are being asked. I might have thought to ask this one question that someone else might not thought of asking, or it could just be that, again those memories can kind of blend together . . . . So little discrepancies are just going to happen with that every time you tell the story. It's not exactly the same every time, but it is important that the important, major details of that

recollection stay consistent, but minor discrepancies wouldn't be too concerning.

(12 RR 141).

*Analysis*

We agree with the trial court's conclusion and the State's argument on appeal that the State's error here was harmless. In comparing the inculpatory evidence against the magnitude of the alleged error, it is clear the State's failure to timely disclose the documents presented at the punishment stage had only a "very slight effect" in determining the jury's verdict.

These documents, if timely disclosed, would hardly have added to the total quantity or the probative weight of Appellant's evidence at trial. Absence of evidence of child sexual abuse from police documents regarding an unrelated incident is not evidence that the abuse never happened. Although the defense lacked these documents at trial, they presented a police report from the same incident and examined the officers who had answered the call. All this evidence strongly supported Appellant's claim that his then-wife did not mention her suspicions of child sexual abuse to the police on August 10, 2014. Yet none of it convinced the jury of his broader theory that his ex-wife and children had fabricated their allegations against him.

Thus, under the facts of this case, the absence of these documents during the guilt-innocence phase could not have had a "substantial and injurious effect" upon Appellant's rights. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v.*

*United States*, 328 U.S. 750, 776 (1946)). Though erroneous, the untimely disclosure's effect if it had any effect at all, was slight. Thus, because the injury was *de minimis* at best, "the verdict and the judgment should stand." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016).

**CONCLUSION**

The failure of the State to disclose impeachment evidence during the guilt-innocence phase was clearly erroneous. However, based upon the facts of this case, there was little to no harm because of the availability of other, stronger evidence to the defense that more directly refuted the same witness's claims. "Given the mildness of the [State's omission] and the strength of the State's case," under Texas Rule of Appellate procedure 44.2(b), there was no "substantial and injurious effect or influence in determining the jury's verdict." *Mosley*, 983 S.W.2d at 260; *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Thus, the trial judge's decision to deny a mistrial was not "so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009) (internal quotes omitted).  We therefore reverse the court of appeals below and affirm the trial court's denial of mistrial.


Filed: July 2, 2025

Publish

33